# United States Court of Appeals
## For the First Circuit

No. 09-2385

ASOCIACIÓN DE PERIODISTAS DE PUERTO RICO, Puerto Rico
Journalists Association; OVERSEAS PRESS CLUB OF PUERTO RICO;
NORMANDO VALENTÍN, individual capacity and on behalf of his
respective Conjugal Partnership; VICTOR SÁNCHEZ, individual
capacity and on behalf of his respective Conjugal Partnership;
JOEL LAGO-ROMÁN, individual capacity and on behalf of her
respective Conjugal Partnership; COSETTE DONALDS-BROWN,
individual capacity and on behalf of her respective Conjugal
Partnership; VÍCTOR FERNÁNDEZ, individual capacity and on behalf
of his Conjugal Partnership; ANNETTE ALVAREZ, individual capacity
and on behalf of her respective Conjugal Partnership,

Plaintiffs-Appellants,

v.

ROBERT MUELLER, in his official capacity as Director of the
Federal Bureau of Investigation; TEN UNKNOWN AGENTS OF THE
FEDERAL BUREAU OF INVESTIGATION, individually and in their
official capacity and on behalf of their Conjugal Partnership;
KEITH BYERS, individually and in his official capacity and on
behalf of his Conjugal Partnership; LUIS S. FRATICELLI,
individually and in his official capacity and on behalf of his
Conjugal Partnership; JOSE FIGUEROA-SANCHA, individually and in
his official capacity and on behalf of his Conjugal Partnership.

Defendants-Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. José Antonio Fusté, U.S. District Judge]

Before
Boudin and Howard, Circuit Judges,
and Barbadoro,[*] District Judge.

---

[*]Of the District of New Hampshire, sitting by designation.

Catherine Crump, with whom Aden J. Fine, ACLU Foundation, Josué Gonzalez Ortiz, William Ramirez, ACLU of Puerto Rico Foundation, and Nora Varga Acosta were on brief, for appellants.

H. Thomas Byron, III, Attorney, Appellate Staff, Civil Division, United States Department of Justice, with whom Tony West, Assistant Attorney General, Rosa E. Rodriguez-Velez, United States Attorney and Barbara L. Herwig, Attorney, Appellate Staff, Civil Division, United States Department of Justice were on brief, for appellees.

---

May 16, 2012

---

**HOWARD, Circuit Judge.** This appeal involves claims for damages and injunctive relief by several journalists against FBI agents, who the journalists allege used excessive force against them during the execution of a search warrant at an apartment complex in San Juan, Puerto Rico.[1] In a prior appeal in this case we vacated a grant of summary judgment based on qualified immunity. See Asociación De Periodistas De P.R. v. Mueller, 529 F.3d 52 (2008) ("Periodistas II"). After further development of the record on remand, the district court again granted summary judgment to the defendants on the Fourth Amendment excessive force claims. We affirm.

## I. Background

We recite the facts in the light most favorable to the plaintiffs, "drawing all reasonably supported inferences in [their] favor." Estate of Bennett v. Wainwright, 548 F.3d 155, 159 (1st Cir. 2008). There is one qualification: "evidence from the moving party as to specific facts can be accepted by the court where no contrary evidence is tendered by the party opposing summary judgment." Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010). The recitation is lengthy but necessarily so given the nature of the events.

---

[1]See Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971).

At approximately 10:00 AM on February 10, 2006, FBI agents executed a search warrant at the apartment home of Lillian Laboy-Rodriguez ("Laboy"). The search was one of six conducted by the FBI that day involving an alleged domestic terrorism plot by a Puerto Rican organization known as "Los Macheteros" (the Machete-Wielders). This organization, dedicated to the independence of Puerto Rico, has been involved in numerous prior violent acts and its former leader was killed in a shoot-out with the FBI less than a year earlier. For some reasons not explained, the FBI did not have assistance from local law enforcement for the operation.

The complex within which the apartment was located was separated from the public street by a permanent, corral-style fence made of metal bars. This fence offered two points of entry into the complex: a narrow pedestrian gate adjacent to a guard booth manned by an employee of the complex and a wider gate for automobiles. The apartment was located on the sixth floor of the building.

Before the search began, Special Agent Keith Byers, who served as the FBI's media representative for the operation, briefed the participating agents about the day's plan. According to Byers, the agents were to establish a perimeter around the operation; he underscored that the media had "the right to do anything outside the perimeter that does not interfere with the operation and/or the safety of the agents and the public."

The FBI agents assert that upon arrival they confirmed with the complex's private security guard that access into the complex was limited to residents or those with legitimate business on the site. The agents did not, however, establish a formal "perimeter" by posting guards, using tape or other means. It does appear that an agent was generally positioned in the vicinity of the pedestrian gate into the complex while the search was being executed upstairs.

Both civilians and law enforcement personnel entered and exited the complex during the search, using both gates; but there is no indication that anyone other than residents, persons having business within the complex, or law enforcement officers entered the complex during most of the period of the lengthy search.[2] The agents also state that anyone attempting to visit the sixth floor was escorted by an FBI agent.

While the FBI executed the warrant, more than a dozen reporters and other members of televison and radio crews arrived to report on the FBI's activities starting at about 11:00 AM. Among the journalists were the individual plaintiffs: television

---

[2]Around 1:00 PM, two women who claimed to be Ms. Laboy's attorneys entered the complex via the vehicle gate. They were quickly confronted by FBI agents nearby who demanded that they exit the complex. After a brief confrontation in which the women demanded to meet with their client, it was ultimately decided that the women would confer with Ms. Laboy downstairs towards the rear of the complex. This confrontation occurred in full view of the assembled press. In fact, one of the attorneys came back to the press and stated that the FBI had threatened her with arrest.

reporters Normando Valentín and Annette Alvarez, radio reporters Cossette Donalds Brown and Joel Lago-Román, and television cameramen Victor Sánchez and Víctor Fernández.

As the day progressed, the reporters were joined by an increasing number of the general public. Some of these people covered their faces with bandanas and some shouted negative comments at FBI personnel. The plaintiffs say that the crowd were never more than twenty or thirty peaceful, non-threatening people. The defendants, in contrast, describe the crowd as being larger and as including potentially violent individuals. The plaintiffs concede that a couple of individuals in the crowd were yelling at the agents.

The FBI agents at the site were concerned enough by the growing crowd that they elected to call-in a quick reaction force to arrive by helicopter and provide additional assistance to the search team. Several reporters went to the helicopter landing area to report on the action and to try to obtain comments. The plaintiffs say the reporters were peaceful; the defendants, that the plaintiffs' actions interfered with law enforcement operations.

At the complex, Agent Byers suspected that one of the allegedly unruly people in the crowd was using his mobile phone to take pictures of him and other agents, leading Byers to fear that this person might be associated with Los Macheteros, as the group was known to publish pictures of FBI agents and promote them as

targets.  Byers also surmised that those individuals in the crowd who had covered their faces were affiliated with Los Macheteros.

Additionally, while the group of on-lookers grew, Special Agent José Figueroa heard from a photographer at the scene, Rafael Rivera, that some people in the crowd were discussing plans to harm FBI employees.  The plaintiffs disclaim overhearing such plans in the crowd and generally dispute that Rivera made this statement to Agent Figueroa.

Later in the afternoon, as the search was concluding at about 2:00 PM, Laboy's daughter Natalia Hernández-Laboy ("Hernández") and Francisco Rodriguez Burns, a reporter, arrived at the scene.  Hernández and Rodriguez entered the complex, but Agent Byers then told Rodriguez that he was not permitted within the complex.  Before Rodriguez left, Hernández gestured to the reporters outside the fence in a way that the reporters interpreted as an invitation to enter the grounds.

Between ten and twenty reporters then quickly entered the complex through the pedestrian gate.  The plaintiffs acknowledge that the gate was held open by Ricardo Santos, the head of a local labor union.  Nearby agents responded swiftly to block the reporters from entering further into the complex grounds, first ordering the reporters to return to the public street.  At least a couple of journalists moved beside or beyond the first group of agents who had intercepted the journalists.  The agents ordered the

journalists to retreat from the complex and began forcibly to impede the path of the reporters and attempt to push them back towards the gate.

The plaintiffs say that they indicated their willingness to leave and that they intended to comply with the agents' demands, but their ability to exit swiftly was blocked by the narrowness of the pedestrian gate and possibly because more people were crowding at the entrance. One journalist requested that the vehicle gate be opened to facilitate the exodus. The plaintiffs admit that some of their members continued to report on the unfolding events as they exited, but they assert that they intended to leave. In what appears to have been less than a minute, the situation inside and around the complex escalated further because the physical confrontation incited the crowd of citizens and remaining journalists outside the complex, who were only a few feet from the agents, separated only by an easily permeated fence.

All of the parties were shouting and yelling in the course of a direct physical confrontation between the heavily armed agents and journalists. One agent testified that someone in the crowd outside the complex spat on his face as he attempted to control the group inside the complex. Inside the complex, numerous agents testified that they perceived the crowd to be either maintaining its position inside the gates or possibly even surging forward.

-8-

Videotapings of the events in question--our consideration of which is discussed below--bear out key portions of the agents' version of events. While the plaintiffs insist on their willingness and desire to comply with the agents' orders that they leave the premises, the videos evince no such effort. Confronted by armed agents and ordered to exit, few, if any, of the people inside the complex made any effort to leave. To the contrary, many of the journalists appear in the films to be confrontational in their response to the agents. The rapid deterioration of the situation is also obvious from the videos.

The agents concluded that those who had entered the grounds were not attempting to leave, that the reporters were being deliberately obstinate, and that the crowd inside the complex posed a danger to the agents, evidence and bystanders. Two of the agents allege that Plaintiff Lago sought to knee one of them in the groin, though Lago specifically denies this version of events.

Eventually, one of the agents on the scene deployed his pepper spray against the journalists inside the complex. He first waved the canister above his head briefly, then fired several bursts of spray into the crowd. At this point, most of the crowd members inside the complex began to move back to the gate, but some remained. Plaintiff Lago was sprayed a second time, directly in the face, and forcibly removed from the complex, which is discussed in more detail below. The pepper spray was also used against at

least one person, a plaintiff cameraman whose individual claims are also discussed more below, who never entered the complex but rather was filming against the fence where Lago was dragged out.

Some of the plaintiffs also allege that they were punched and kicked by the FBI agents as they were forced out of the complex, suffering bruises and other injuries. One FBI agent agrees that he struck one of the plaintiffs. According to the plaintiffs, the pepper spray disoriented the reporters, which made the crowd's movements all the more unpredictable.[3] They also underscore that nothing violent had occurred before the FBI agents used force against the journalists. Nevertheless, after the pepper spray was used, agents were quickly able to force all who had entered back out of the pedestrian gate and on to the street.

The six individual plaintiffs all allege that excessive force was used against them during the melee. Valentín asserts that he was pushed and punched by at least one FBI agent, that Agent Byers elbowed and hit him, and that it took him several weeks to recover. Sánchez says that he, too, was pushed and that it took

---

[3]The defendants underscore that after the clash between the FBI and the reporters, the crowd was unruly and abusive. Some crowd members threw hard objects at agents and their vehicles, breaking the windows in at least one vehicle. We do not consider here the conduct subsequent to the use of force to justify what may have instigated it: dramatic as these details may be, they do not impact our analysis of the situation at the time of the alleged Fourth Amendment violations and whether a reasonable officer in that situation would have considered the force used to be reasonable.

him weeks to recover from his pepper spray injuries. Donalds-Brown and Alvarez do not claim that they were punched or hit, but they do say that they were aggressively pushed out of the gate, and that they suffered from the lingering effects of that force as well as from those of the pepper spray.[4]

Lago first says that agents pointed weapons at him for no apparent reason as he tried to interview them while they exited the helicopter. He also says that during the fracas inside the complex an agent grabbed him and pushed him while he expressed his intention to leave, and that an agent hit him with a baton and used it to push him towards the gate, but he could not retreat because the crowd was pressed up behind him. Even after Lago announced that he was leaving, Agent Byers allegedly shoved him several more times.

Shortly thereafter, one of the agents resorted to pepper spraying the crowd. Lago says that the initial burst of spray and resulting chaos caused him to fall to the ground from disorientation and pain. While on the ground, he was sprayed a second time directly in the face behind the sunglasses that he was wearing. Before he could regain his orientation an agent picked

---

[4]However, plaintiff Alvarez--who was among a group inside the fence who encountered pepper spray--alleges that she was (unbeknownst to her) four weeks pregnant at the time of the encounter; that "my pregnancy eventually resulted in a miscarriage"; and that "I strongly believe that the stress and anxiety that I suffered during this event played a great role in my miscarriage."

-11-

him up and dragged, tossed, and kicked him forward until he was outside the gate.

The defendants describe the agents' encounters with Lago differently. First, an agent who was at the helicopter landing says that Lago had stepped between him and the helicopter while he was giving hand signals to the agents exiting the aircraft. He also says that Lago and other reporters followed him and interfered with the performance of his duties, including physically touching him, but he just stepped around the reporters.

With respect to Lago's forced removal from inside the fence, Byers recalls that Lago had intruded through the pedestrian gate and was ordered to leave; when Lago did not do so, Byers gripped him by the arm and attempted to walk him back to the pedestrian gate. Byers later struck Lago when he observed him struggling with a nearby agent and believed Lago to be physically assaulting the agent. When Lago dropped to the ground near the gate after the initial burst of pepper spray, the agent using the spray perceived that he had gone to the ground in an act of resistance and sprayed him again. A third agent then physically removed Lago by dragging and pulling him out of the complex so the agents could close the gate.

Fernández recounts that he was filming events from a vantage point on the outside of the fence, but close to it, as Lago was being forcibly removed from the complex. According to

-12-

Fernández, an agent noticed him and, approaching within a few feet of him, sprayed him directly in the face with pepper spray even though he and those around him were still outside the fence and had not demonstrated any violent behavior or attitude toward the agents.

The defendants say that Fernández was sprayed while an agent attempted to force back members of the crowd who were gathered around the gate just a couple of feet from the agents. The defendants say that they took that action believing that their own safety was in danger because the crowd around the gate where Fernández was positioned was growing increasingly unruly and was starting to throw objects at agents.

On this evidentiary array based on the summary judgment record, the district court held that the defendants were entitled to qualified immunity. Acknowledging that an issue of fact existed about whether excessive force had been used, the court concluded that the agents' conduct was not so unreasonable that they should be held to know that it violated the Fourth Amendment. Asociación de Periodístas de P.R. v. Mueller, No. 06-1931, slip. op. at 2-3 (D.P.R. Aug. 13, 2009) ("Periodistas III"). The district court also denied future injunctive relief, holding that the plaintiffs lacked standing to pursue this relief. Id. at 26.

The appeal is taken from both of these rulings. In addition, the plaintiffs argue that the district court made

procedural errors, principally by denying them the opportunity to pursue essential discovery while relying on depositions of some of the defendants to which the plaintiffs were denied an opportunity to respond, as well as by failing to rule on the admissibility of the defendants' video evidence. We turn to these procedural plaints first.

## II. Discussion

### A. Discovery and Reliance on Depositions

The plaintiffs argue that the district court wrongly denied them the opportunity for adequate discovery; our review on this issue is for abuse of discretion, Rivera-Torres v. Rey-Hernández, 502 F.3d 7, 10 n.2 (1st Cir. 2007), and we will intervene "only upon a clear showing [that] . . . the lower court's discovery order was plainly wrong and resulted in substantial prejudice to the aggrieved party." Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 91 (1st Cir. 1996) (citing Resolution Trust Corp. v. N. Bridge Assocs., Inc., 22 F.3d 1198, 1203 (1st Cir. 1994)) (internal quotation marks omitted). Also reviewed for abuse of discretion is the district court's reliance on evidence to which plaintiffs say they did not have a chance to respond. Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc., 754 F.2d 404, 409-410 (1st Cir. 1985).

After the defendants moved for summary judgment, the plaintiffs requested discovery pursuant to Rule 56(f) (now

encompassed in Rule 56(d)) targeted at whether there was a perimeter, whether the agents' fear of Los Macheteros or members of Puerto Rico's independence movement was reasonable, and whether the crowd was unruly.[5] The district court granted the motion in part, allowing the plaintiffs to depose only those individuals who had supplied affidavits in support of the summary judgment motion. The plaintiffs argue that the imposition of this limitation was an abuse of discretion.

A basic tenet of Rule 56(f) practice is that the party seeking discovery must explain how the facts, if collected, "will suffice to defeat the pending summary judgment motion." Mir-Yepez v. Banco Popular de P.R., 560 F.3d 14, 16 (1st Cir. 2009) (citing Rivera-Torres, 502 F.3d at 10). The plaintiffs fall short of meeting this requirement with respect to the depositions of Hernández, Rodriguez, Rivera, and the FBI agents.

Whether Hernández invited the plaintiffs onto the property is not relevant to the question of the reasonableness of the defendants' actions in responding to what was, at a minimum, a turbulent crowd. Nor does the qualified immunity question turn on

---

[5]Specifically, they sought leave to depose all FBI agents at the scene, Natalia Hernández-Laboy, private security guard Mary Ann Rodriguez, and non-plaintiff photographer Rafael Rivera, who allegedly warned the agents of potential harm to them. The plaintiffs also requested various documents from the FBI, including the agents' "after action" reports and their prior written statements, records of the FBI's post-incident investigation, and any operational plans related to the search.

whether the gate was opened for the plaintiffs by Rodriguez, the security guard. The plaintiffs argued in the district court that deposing Rivera was necessary to address whether the defendants reasonably feared the crowd. Given the ample evidence in the record describing the events in detail, there was no abuse of discretion in denying this request. The precise words that Rivera may have spoken to Agent Figueroa do not alter the calculus. There was also no abuse of discretion in the decision to deny permission to depose the estimated 25-45 non-defendant FBI agents who were at the scene. The question before the court on summary judgment centered on the perceptions of the defendant agents.

The denial of the plaintiffs' request for the report prepared by the FBI Office of Professional Responsibility was also within the district court's discretion. The plaintiffs argued below that a report finding that the agents violated FBI policy would be probative of the qualified immunity question. But the plaintiffs do not dispute that both a sworn declaration from Special Agent Figueroa and deposition testimony from one of the defendant agents indicates that no such finding was made. Thus the plaintiffs have failed to demonstrate how the report would help to defeat summary judgment. See Rivera-Torres, 502 F.3d at 10.

With respect to the remaining documents, we note that the district court ordered the defendants to produce written statements prior to their depositions. After the depositions, the plaintiffs

sought additional statements that they claimed were revealed by the deponents during their depositions. The district court denied any further relief. As the plaintiffs, here again, have failed to establish how these additional documents would have enabled them to defeat summary judgment, we find no abuse of discretion.

In sum, the district court's carefully crafted discovery limitations were consistent with the "importance of resolving qualified immunity questions at the earliest possible stage in the litigation," Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982), and within its discretion.

We turn to the plaintiffs' complaint that the district court should not have relied on the defendants' depositions. After the defendants had moved for summary judgment and the plaintiffs had deposed the defendants' affiants, the plaintiffs filed an opposition arguing that the defendants should not be permitted to submit new evidence or arguments in their reply. The defendants nevertheless filed a reply referencing the depositions, and the district court ordered that the deposition transcripts be scanned into the record.

In citing to these depositions while addressing whether any issues of material fact existed, the court noted that it was permitted to "examine the entire record, including all discovery and disclosure materials on file." Periodistas III, slip. op. at 9 (citing Fed. R. Civ. P. 56(c)). The district court's action was

-17-

proper. Courts and parties "have great flexibility with regard to evidence that may be used on a Rule 56 proceeding," and as Rule 56(c) makes clear, in deciding summary judgment motions courts "may consider any material that would be admissible or usable at trial," including depositions.[6]

The plaintiffs have not argued that the depositions would be unusable at trial or that they were irrelevant "to determin[ing] whether any of [the issues presented] [were] real and genuine and whether any of post-pleading material suggests the existence of any other triable issues of material fact."  10A Wright, Miller & Kane, Federal Practice and Procedure § 2721.  The district court was within its discretion to consider them.

**B. Video Clips**

In the district court, the judge had before him video footage of the events in question although they are not specifically discussed; and the government's brief in this court cites to these materials.  The video clips were submitted by the FBI in support of its motion and consist of clips from material aired during local news broadcasts.  Plaintiffs say that the film

_____

[6]10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2721 (3d ed. 1998); see also Horta v. Sullivan, 4 F.3d 2, 7-8 (1st Cir. 1993) ("Summary judgment is to be decided on 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.'" (quoting Fed. R. Civ. P. 56(c))). In its current form, Rule 56 states that a court considering summary judgment "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. 56(c)(3).

clips were not properly authenticated, violate the Best Evidence Rule, Fed. R. Evid. 1001(2), and may not be relied upon in deciding this case.

Authentication is a straightforward concept requiring a "reasonable probability" that the item in dispute is what its proponent claims. Fed. R. Evid. 901(a); United States v. Cruz, 352 F.3d 499, 506 (1st Cir. 2003). The proponent "need not rule out all possibilities inconsistent with authenticity"; so long as the "evidence is sufficient to allow a reasonable person to believe the evidence is what it purports to be," it is left to the factfinder to determine what weight it deserves. United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997).

An item's "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances," are all relevant. United States v. Holmquist, 36 F.3d 154, 167 (1st Cir. 1994); United States v. Paulino, 13 F.3d 20, 23 (1st Cir. 1994). At issue here are clips from multiple news programs with proprietary production sets and locally-known television personalities from various stations, each including clips that indisputably show the same incident from different camera perspectives--all of which suggests these are actual news clips with footage from the scene.

The video clips were accompanied by a declaration of Jessica Tirado Gonzalez, the general manager of Publimedia, a

company that "specializes in monitoring Puerto Rico media outlets." Tirado's declaration said the FBI hired Publimedia and it recorded seven such programs about the incident--though "only those portions of news broadcasts that pertained to the FBI's execution of the search warrant" and not "portions of news programs concerning other topics." Tirado stated that the four DVDs submitted by the defendants contained true and correct copies of those recordings. The plaintiffs do not suggest otherwise.

The plaintiffs describe the videos as "incomplete" and "extensively edited" versions of the original TV broadcasts but make no claim of (or offer any reason to suspect) fraud or tampering, nor do they say that the videos do not show actual footage of the incident in question (in fact their own expert relied on the video footage in forming his own opinions). Cf. United States v. Wheeler, 800 F.2d 100, 106 (7th Cir. 1986), overruled on other grounds by United States v. Sblendorio, 830 F.2d 1382, 1393 (7th Cir. 1987); Louis Vuitton S.A. v. Spencer Handbags Corp., 765 F.2d 966, 973-74 (2d Cir. 1985).

Further, the affidavits and depositions of several FBI agents expressly confirmed the accuracy of the footage on the four DVDs. For example, Agent Byers, designated as the FBI's on-scene media representative at the search warrant execution, said that numerous news outlets were present filming the incident, and also stated several times in substance that the media footage accurately

-20-

reflected what occurred (e.g., "As shown in video footage and according to my direct observation . . . .").

In sum, on the facts presented, there is no serious basis for disputing the authenticity of the videos. While the plaintiffs could have offered specific reasons why they are not fair depictions or argued that specific portions (or omissions) are misleading or prejudicial, they have not done so. See United States v. Goldin, 311 F.3d 191, 197 (3d Cir. 2002); Louis Vuitton S.A., 765 F.2d at 973-74; 2 Broun et al., McCormick on Evidence § 216, at 27 (6th ed. 2006). The authentication argument thus fails.

The plaintiffs also repackage their attack as a Best Evidence Rule challenge, but the rule is a mechanical one and was satisfied here. The Best Evidence Rule, with some exceptions, requires the use of an original writing, recording, or photograph[7] in proving its material contents, but a copy of a video recording is a "duplicate" admissible "to the same extent as the original," Fed. R. Evid. 1001 & Fed. R. Evid. 1003 advisory committee's note, which largely ends the Best Evidence Rule inquiry in a case like this one.

The plaintiffs say that language in an advisory committee note creates an exception for copies that leave out important material. See Fed. R. Evid. 1003 advisory committee's note (citing

---

[7]Video tapes are considered "photographs" for purposes of the rule. Fed. R. Evid. 1001 advisory committee's note.

United States v. Alexander, 326 F.2d 736 (4th Cir. 1963)); Toho Bussan Kaisha, Ltd. v. Am. President Lines, Ltd., 265 F.2d 418 (2d Cir. 1958)).  Here they say that the videos are incomplete because of the absence of footage in one video clip showing the entrance of journalists into the complex, and the absence in another clip of certain use of pepper spray.

But this does not show that the videos are inaccurate or incomplete in the incidents that they depict or that taken together the tapes fail to include such footage of the entrance of reporters or the use of pepper spray.  The exception alluded to by the plaintiffs is for extreme situations where there is reason to suspect extensive prejudicial manipulation, Alexander, 326 F.2d at 738 & n.4, or fraud, Toho Bussan, 265 F.2d at 424, and the plaintiffs' objections about the videos do not rise to such a level.

## C. Qualified Immunity

We review a grant of summary judgment on qualified immunity grounds de novo.  Estate of Bennett, 548 F.3d at 165.  If "the evidence on the record is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side," then we cannot affirm the grant.  Id. at 165 (internal quotation marks omitted).

The qualified immunity analysis asks whether the facts alleged or shown by the plaintiff make out a violation of a

constitutional right and whether the right was clearly established at the time of the violation. Soto-Torres v. Fraticelli, 654 F.3d 153, 158 (1st Cir. 2011) (citing Pearson v. Callahan, 555 U.S. 223, 232 (2009)). A right is clearly established if it would be plain to a reasonable officer that his conduct was unlawful in the particular factual context that he faced. Id. (quoting Brosseau v. Haugen, 543 U.S. 194, 199 (2004)); Decotiis v. Whittemore, 635 F.3d 22, 36 (1st Cir. 2011).

The district court concluded that a reasonable jury could have found that the plaintiffs' allegations established violations of their Fourth Amendment right not to be subject to unreasonable seizures. But, noting the lack of controlling precedent as to whether a non-arrest such as the one at issue here could be considered a "seizure" within the meaning of the Fourth Amendment, the court concluded that those rights were not clearly established at the time of the events and that the defendants were therefore entitled to qualified immunity. Even if viewed as a seizure, the court found the force employed by the defendants was reasonable in light of the circumstances as they reasonably could have perceived them.

We need not follow the steps of the qualified immunity analysis sequentially. See Maldonado, 568 F.3d at 269-70; see also Pearson, 555 U.S. at 235-36. "Indeed, . . . where the answer to the first prong of the immunity question may depend on the further

-23-

development of the facts, it may be wise to avoid the first step." Maldonado, 568 F.3d at 270. We also needn't follow the same analytical path as the district court. See Rosenberg v. City of Everett, 328 F.3d 12, 17 (1st Cir. 2003) ("We may affirm the [summary judgment] decision on any grounds revealed by the record."). We therefore turn directly to whether reasonable officers would have known that their conduct was unlawful.

Saucier holds that "[e]xcessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." 533 U.S. at 207. We judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[8] The combination of the two reasonableness standards--that of qualified immunity and that of the Fourth Amendment--serves to protect officers from their reasonable mistakes. Solis-Alarcón v. United States, 662 F.3d 577, 581 (1st Cir. 2011).

Thus, qualified immunity can protect officers from litigation based on misjudgments about where lies the "sometimes hazy border between excessive and acceptable force." Saucier, 533

---

[8]Graham, 490 U.S. at 396 (emphasis added); see also Saucier, 533 U.S. at 201 (the reasonableness inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition. . . .").

U.S. at 206. "Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." Brosseau, 543 U.S. at 198 (citing Saucier, 533 U.S. at 206). For example, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, . . . the officer would be justified in using more force than in fact was needed." Saucier, 533 U.S. at 205; accord Estate of Bennett, 548 F.3d at 175 (quoting Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007)) (not "unreasonable" simply because officer "failed to 'perfectly calibrate the amount of force required to protect [him]self.'").[9]

Taking the facts in the light most favorable to the plaintiff reporters, the agents' actions were still reasonable in light of the combustible situation that they faced. The agents were executing a warrant related to what they viewed as an anti-terrorism investigation, involving an organization known for its reputation for violence and one that had been involved in a recent shoot-out with FBI agents. The agents had been told not to expect

---

[9]See also Statchen, 623 F.3d at 18 ("While qualified immunity is often invoked in cases where legal principles were unclear at the time of the disputed conduct, it also protects reasonable assessments of fact, even if matters might have been handled differently in the calm of retrospective appraisal. The aim of the doctrine in both cases is to avoid the chilling effect of second-guessing where the officers, acting in the heat of events, made a defensible (albeit imperfect) judgment." (internal citations omitted)).

backup from local authorities--they were on their own for the duration of the operation.

While the crowd members present during the day were, on the plaintiffs' version of facts, primarily journalists, it is not disputed that a small but vocal group of protesters were agitated and yelling at the agents. As already recounted, one agent testified that he had been told that crowd members had discussed violence against the agents. The crowd members were just feet from the agents, separated by a fence or gate depending on their location.

Throughout most of the day, everyone agrees that the protesters and journalists remained on the other side of the fence. The plaintiffs vigorously dispute that there was a "perimeter" enforced by the agents because no tape was used nor were any agents stationed alongside the wall. A formal perimeter may or may not have been officially established, but the fence indisputably separated the agents from the public and journalists prior to the events in question. The group entrance was unquestionably a significant change in the circumstances.

When a large group of people suddenly intruded the complex, a reasonable agent could have perceived that the security situation was seriously threatened. The plaintiffs insist that only journalists entered the complex, though they also acknowledge that the pedestrian gate was held open by the leader of a local

-26-

labor union.  A reasonable agent could reasonably have believed that some number of non-journalists had entered, or would enter as well, based in part on intimations and evidence that some members of the crowd were angry or hostile.

The agents immediately intercepted the group that entered the complex, ordered them to move back and return outside the complex, and sought to block their path.  At the point of this physical confrontation, numerous agents testified to their concern for themselves, their fellow agents, and the growing number of bystanders immediately outside the complex.  The scene was escalating quickly as the crowd both inside and outside the complex became more agitated in light of the physical confrontation between the agents and reporters.

The reporters say that they were attempting to comply with the agents' orders and retreat out of the complex but that their exit was hampered by the narrow passageway back out.  But they admit that some of their number inside the complex were continuing their efforts to report on the situation.  The agents, reasonably perceiving a volatile situation that was getting worse by the minute as the crowd became more agitated, resorted to increasing levels of force in an attempt to push the crowd back outside the complex, culminating with the use of pepper spray and the physical removal of at least one of the plaintiffs.

Given the perceived noncompliance by the crowd inside the complex, the previous verbal threats, the presence of FBI personnel, civilians and evidence within the vicinity, and the serious concerns about maintaining control of the area, the agents reasonably could have concluded that the level of force that they used was appropriate. In calm retrospection one may be tempted to question the necessity or wisdom of specific agents' actions against particular plaintiffs (and we will discuss those actions next), but we cannot say with respect to any of the agents' conduct, in gross, that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Maldonado, 568 F.3d at 269 (internal quotation marks omitted).

Moreover, contrary to the plaintiffs' suggestion, the FBI's policy at the time of the events in this case does not undermine the conclusion that the agents' use of pepper spray against the reporters as a crowd was reasonable. See Hope, 536 U.S. at 742 (holding that agency regulations can be relevant as to whether officers have fair warning that conduct is a potential constitutional violation). The policy permitted the use of pepper spray in the event that "[t]he subject is likely to cause serious bodily injury if not controlled, and force is necessary to safely achieve control." In addition, as the district court noted, "[w]here feasible, Special Agents were to give subjects an opportunity to surrender before using pepper spray, and were to

-28-

consider whether subjects were noncompliant or had resisted law enforcement orders, whether there had been verbal or nonverbal threats, and the presence of persons in the vicinity of the risk." Periodistas III, slip op. at 4-5.[10]

The individual claims of plaintiffs Fernández and Lago require additional discussion. Agent Byers contends that he first turned his attention to Lago because he perceived that Lago was intentionally refusing to leave the complex and physically resisting efforts to remove him. Byers grabbed him and sought to push and pull him out of the gate. Byers was successful in getting Lago back into the mass of reporters, but Lago remained inside the complex.

Soon thereafter, Byers saw what he believed to be Lago attempting to strike another agent struggling with the reporters and heard the other agent threaten Lago with arrest. Byers agrees that he then struck Lago in the chest with a jabbing motion of his baton to force him back and away from the agent. Lago's version of these events is that he was attempting to leave and that he never attempted to strike any of the agents. But the key question is

_____

[10]Although they acknowledge that the agents asked them to leave the premises, the plaintiffs say that they were not warned about the imminent use of pepper spray, nor given "an opportunity to surrender before using pepper spray." But the existence and feasibility of such warnings are among a number of FBI pepper spray policy factors, and our assessment of reasonableness does not rest solely on the policy.

whether, in the melee, Byers could reasonably have believed otherwise.

Soon afterwards, Lago was hit by the first round of pepper spray. He says that he fell to the ground because of the pain and disorientation, while the agents perceived him to be resisting the orders to leave. As the agent who used the pepper spray stated in explaining his targeting of Lago:

> After [Lago] sat down and . . . was passively resisting, I noticed that he was wearing sunglasses. So I went and I pepper sprayed him to make sure that he actually got some pepper spray on him so that he could quit resisting.

Following this second burst, Lago was forcefully removed from the complex by a third agent who said that Lago intentionally went limp in an effort to obstruct the effort to remove him.

To be sure, a jury might find that the agents were mistaken and that Lago had, in fact, not attempted to strike any of the agents. The jury could also find that he fell to the ground in confusion and pain. But it is also true that the defendants could reasonably have perceived Lago as one who resisted leaving the compound. Qualified immunity protects officers from their "reasonable mistakes," Solis-Alarcón, 662 F.3d at 581, and given the chaotic situation, we cannot conclude that the agents' actions constituted unreasonable mistakes.

Fernández's situation is distinguishable from those of the other plaintiffs because he never intruded inside the gate and was on the street-side of the fence when he was pepper sprayed at

-30-

very close range.  He also claims that the FBI agent who sprayed him targeted him personally.  The agents did not claim that he had entered the gate; their concern, it appears, was that by the time Fernández was sprayed, the crowd outside the pedestrian gate immediately adjacent to Fernández had become unruly as a result of the agents' use of force inside the compound.

The evidence, including both the agents' statements and what can be discerned from the videos, bears out this assessment and leaves unimpeached the agents' claim that people in the crowd close to Fernández were antagonizing the agents by shouting negative comments and slurs, even if Fernández is credited in saying that he saw no one close to him throwing anything.  The agents could reasonably have sought to disperse those crowding in at the perimeter.

Fernández claims to have been singled out, but the agent says that he was attempting to spray agitated crowd members threatening the officers by the gate.  While we take disputed facts in favor of the plaintiffs, Fernández's allegations regarding the subjective beliefs of the agent are pure speculation.[11]  Given the

---

[11]As one agent who employed pepper spray at the time Fernández was hit explained in his deposition, "I had to deploy pepper spray again as . . . the agent who escorted the reporter that . . . was dragged out [i.e., Lago]. . . and at one point there was a continuation of gravel flying at us, so I deployed pepper spray towards the individuals that were continuing to throw stuff at us." Fernández claims that although the crowd near him may have been yelling, no one immediately around him had escalated his conduct to violence by spitting or throwing.

circumstances, we conclude that a similarly situated reasonable agent could have made the same decisions. See Estate of Bennett, 548 F.3d at 175-76. In sum, we affirm the grant of summary judgment on the plaintiffs' Fourth Amendment claims on the grounds of qualified immunity.

## D. Injunctive Relief.

The plaintiffs sought an injunction prohibiting the defendants from using like force during media coverage of future FBI operations and requiring the FBI to develop policies and procedures to ensure that the media may report on future FBI raids "free from unwarranted attacks and other interferences from the FBI." We conclude that the district court properly denied injunctive relief, there being no indication that repetition was likely. Weber v. Cranston Sch. Comm., 212 F.3d 41, 47 n.7 (1st Cir. 2000).

To justify an injunction when the incident now lies in the past, there must be a "real and immediate threat" of future legal violations rather than an abstract or conjectural one, City of Los Angeles v. Lyons, 461 U.S. 95, 101, 105 (1983). The plaintiffs' assertions, like those in Lyons, fail on this account. The plaintiffs are correct that Lyons requires them credibly to allege a realistic threat of future injury, but they are incorrect in concluding that their affidavits "are more than sufficient" to meet that standard.

The plaintiffs' subjective fears of conflicts with agents during their possible future press coverage of FBI activities are generic, speculative, and fail to demonstrate a "real and immediate threat" of likely future violations.  Any past harm that they allegedly suffered does not by itself entitle them to obtain equitable relief "'[a]bsent a sufficient likelihood that [they] will again be wronged in a similar way,'" Amer. Postal Workers Union v. Frank, 968 F.2d 1373,  1376 (1st Cir. 1992) (quoting Lyons, 461 U.S. at 111 (1983)).

Nor is it enough that the reporters expect in the future to cover FBI activities.  See Lujan v. Defenders of Wildlife, 504 U.S.  555,  564  (1992)  (explaining  that  affiants'  expressed intentions of being in a future situation where they might be deprived "is simply not enough.  Such 'some day' intentions-- without any description of concrete plans, or indeed even any specification of when the some day will be--do not support a finding of the 'actual or imminent' injury that our cases require.").

On the contrary, the circumstances of this case combine peculiar features--including the special concerns when suspected terrorism is involved, the lack of support from potentially large numbers of local police, the unusual duration of the search, and the lack of an entirely secure perimeter.  Hopefully, as well, the FBI agents will have learned some lessons in coping with a

disruptive gathering crowd since it is not in their own interest to court repetition.

The judgment is affirmed. All parties will bear their own costs on this appeal.

It is so ordered.